**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 23-1841**

_____

MARINE CLUB MANAGER, INC.; EBRM RESURRECTION LLC; ERIC BLUMENFELD,

                    Petitioners - Appellants,

        v.

RB COMMERCIAL MORTGAGE LLC,

                    Respondent - Appellee.

_____

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte.  Max O. Cogburn, District Judge.  (3:22-cv-00609-MOC-DCK)

_____

Submitted:  March 1, 2024                          Decided:  August 1, 2024

_____

Before DIAZ, Chief Judge, QUATTLEBAUM, Circuit Judge, and TRAXLER, Senior Circuit Judge.

_____

Affirmed by unpublished per curiam opinion.

_____

**ON BRIEF:** Neil A. Riemann, PARRY LAW PLLC, Chapel Hill, North Carolina; Benjamin A. Garber, Melissa A. Anderson, BRAVERMAN KASKEY GARBER P.C., Philadelphia, Pennsylvania, for Appellants.  Gerald J. Stubenhofer, Jr., Cameron J. Comer, MCGUIREWOODS LLP, Pittsburgh, Pennsylvania, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Eric Blumenfeld and his related companies, Marine Club Manager, Inc. and EBRM Resurrection, LLC ("Appellants"), appeal from an order of the district court confirming an arbitration award in favor of RB Commercial Mortgage, LLC, in a case arising under the court's diversity jurisdiction.[1] We affirm.

I.

Appellant Eric Blumenfeld, a real estate developer, owns an old commercial building in Philadelphia that he converted into an apartment complex called Marine Club Apartments (the "Property"). In 2014, Blumenfeld recapitalized the Property, obtaining a $25 million mortgage from Cantor Commercial Real Estate Lending (the "Mortgage Lender") and receiving a $3.35 million preferred equity investment from RB Commercial Mortgage (the "Capital Investor"), a limited liability company located in North Carolina. As part of this recapitalization, Blumenfeld created Marine Club Associates, LLC (the "Company") to own the Property and Marine Club Manager, Inc., to serve as manager of

---

[1] As we recently recognized in our *SmartSky* decision, pursuant to the Supreme Court's decision in *Badgerow v. Walters*, 596 U.S. 1 (2022), a federal court "faced with an application to enforce or vacate an arbitration award under Sections 9 or 10 of the Federal Arbitration Act, 9 U.S.C. §§ 1, *et seq.* (the "FAA"), must have a basis for subject matter jurisdiction independent from the FAA and apparent on the face of the application." *SmartSky Networks, LLC v. DAG Wireless, LTD.*, 93 F.4th 175, 178 (4th Cir. 2024). "If [the face of the application] shows that the contending parties are citizens of different States (with over $75,000 in dispute), then [28 U.S.C.] § 1332(a) gives the court diversity jurisdiction." *Badgerow v. Walters*, 596 U.S. at 9. As the applications to confirm and vacate the arbitrator's award in this case make clear that the diversity jurisdiction statute's requirements are satisfied, we have jurisdiction over this appeal.

2

the Property. The Property is the Company's only asset. Blumenfeld owns 92% of the Company; Capital Investor holds the remaining 8%.

The rights and duties of the parties are set out in a contract (the "Operating Agreement") executed by Blumenfeld, Marine Club Manager, and Capital Investor. Under the Operating Agreement, Blumenfeld and his companies are generally in charge of the management and operation of the Property, but the consent of Capital Investor is required for certain specified actions.

As for the rights of the parties, the Operating Agreement stipulates that Capital Investor is entitled to a return of at least 150% of its capital investment, plus 12.5% interest, to be paid over 10 years through monthly Minimum Distribution payments of approximately $35,000. The Operating Agreement calls the full amount that Capital Investor is entitled to receive the "Required Redemption Amount." Once Capital Investor receives the Required Redemption Amount, its equity interest in the Property is "redeemed," at which point Capital Investor "shall have no further rights, obligations or duties pursuant to this Agreement or otherwise with respect to the Company." J.A. 65.

At Blumenfeld's request, Capital Investor agreed to accept a smaller stake in the Company in exchange for additional rights for itself and certain restrictions on Blumenfeld's control over the Company. These rights and restrictions are spelled out in the Operating Agreement in sections addressing "Changeover Events" and "Full Recourse Events." Changeover Events, which allow Capital Investor to take over operational control of the Company while still remaining part of the venture, include the failure to make a Minimum Distribution to Capital Investor and the declaration by Mortgage Lender of an

3

event of default under the mortgage. Full Recourse Events, which allow Capital Investor to force a full redemption of its investment and thus extricate itself from the venture, include interference with Capital Investor's exercise of its rights after a Changeover Event and a breach of the restrictions in the Operating Agreement on the transfer of interest in the Property or the Company.

In the fall of 2019, the Company started having difficulties meeting its financial obligations. The November 2019 mortgage payment was short, and the Company remained a month behind in payments until July 2020, when it stopped making payments entirely. Although the Operating Agreement required the Company to pay the mortgage before paying Capital Investor its Minimum Distributions, the Company nonetheless paid the Minimum Distributions from December 2019 through March 2020. Capital Investor knew the Company was behind on the mortgage when it received the distributions.

Once the effects of the COVID shutdowns started to be felt, Blumenfeld asked Capital Investor about a forbearance of the Minimum Distributions, an action that would require amendments to the Operating Agreement and the approval of Mortgage Lender. Capital Investor informally agreed to a suspension of the Minimum Distribution payments while the details were worked out and the agreement of Mortgage Lender was sought. Mortgage Lender had previously learned that the Company had paid the Minimum Distributions even though the mortgage was not current, so it refused to consent to the proposed changes to the Operating Agreement. The Company did not resume distribution payments to Capital Investor after the forbearance deal fell apart.

4

As noted above, the Company quit making mortgage payments entirely in July 2020. On September 15, 2020, Mortgage Lender declared an Event of Default because of non-payment and triggered a "cash management event" under the mortgage documents. This cash management event—which the parties refer to as a "cash trap"—required the Company to deposit all rent payments in a specified bank account to which Mortgage Lender had access. Blumenfeld did not comply and instead directed that the rent payments instead be deposited in an account that Mortgage Lender could not access. The last deposit of rents into the account specified by Mortgage Lender was made on October 6, 2020. Mortgage Lender initiated foreclosure proceedings in April 2021.

In October 2020, Capital Investor determined that the Company's failure to make the Minimum Distributions constituted a Changeover Event that triggered its right to take over operation of the Property. Capital Investor sought Blumenfeld's contractually required cooperation in replacing the management company and requested his signature on a Changeover Resolution that would enable the replacement of the management team. Blumenfeld did not take any steps to cooperate and did not sign the resolution.

On November 17, 2020, Capital Investor initiated an arbitration proceeding against Appellants seeking a declaration that Changeover Events and Full Recourse Events had occurred. Appellants filed a counterclaim alleging that Capital Investor had materially breached the Operating Agreement. Shortly before the arbitration hearing, Blumenfeld offered approximately $3 million of non-Property proceeds to voluntarily redeem Capital Investor's interest in the Property. Capital Investor rejected the offer, contending the amount offered was less than the Required Redemption Amount.

5

After a hearing, the arbitrator issued a partial award that found in favor of Capital Investor on the liability question and rejected Appellants' counterclaim, but held open the issue of attorney's fees. The arbitrator concluded that multiple Changeover Events had occurred and that Capital Investor was therefore entitled to exercise the remedies set out in the Operating Agreement, including a takeover of the operation of the Property. The arbitrator also determined that two Full Recourse Events had occurred.

Because a Full Recourse Event had occurred, the Company was required to pay Capital Investor the Required Redemption Amount. The arbitrator concluded that the unpaid portion of the initial investment was $3,347,000, and that Capital Investor was entitled to interest at a rate of 19.5%--the original 12.5% preferred return rate plus the additional 7% preferred return rate provided for by the Operating Agreement if a Changeover Event occurs. As of July 5, 2022, the total interest owed was $1.95 million, for a total Required Redemption Amount of $5.3 million. Interest continues to accrue at the 19.5% rate.

After the arbitrator issued the partial award, Blumenfeld's attorney offered to wire Capital Investor the full amount awarded by the arbitrator. Capital Investor declined, arguing that because of the priority of payments spelled out in the Operating Agreement, the mortgage must be satisfied before the Required Redemption Amount can be paid. Blumenfeld put the full amount of the award in his attorney's trust account and then filed a petition seeking clarification from the arbitrator as to whether Blumenfeld could use non-Property proceeds to redeem Capital Investor's interest without first satisfying the mortgage.

6

The arbitrator issued a clarification of the award explaining that because a Full Recourse Event had occurred, Blumenfeld was liable to Capital Investor for the Required Redemption Amount. However, the arbitrator determined that Blumenfeld could not then redeem Capital Investor's interest because section 7.2 of the Operating Agreement precludes distributions to Capital Investor from the Property proceeds ahead of debt service on the mortgage loan. In addition, section 13.2 of the Operating Agreement subordinates any debt Blumenfeld owes to Capital Investor as long as Mortgage Lender has a "claim" against Blumenfeld as guarantor of the mortgage. Because the mortgage was in default and the subject of a foreclosure proceeding, the arbitrator concluded that Mortgage Lender had a claim against Blumenfeld and that Blumenfeld was obliged to satisfy the mortgage before paying Capital Investor.

The arbitrator subsequently issued a final award that incorporated the partial award and the clarification award. The final award also gave Capital Investor, as the prevailing party, $1.8 million in attorney's fees and costs. After the arbitration appeals panel affirmed the award, Capital Investor filed a motion in federal district court seeking to confirm the award, and Appellants filed a counterpetition seeking to vacate the award. The district court granted Capital Investor's petition and confirmed the award. This appeal followed.

## II.

The Federal Arbitration Act authorizes a court to vacate an arbitration award only in limited situations:

> (1) where the award was procured by corruption, fraud, or undue means; (2) where there was evident partiality or corruption in the arbitrators, or either of them; (3) where the arbitrators were guilty of misconduct in refusing to

7

postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a). In addition to these statutory grounds, this court has recognized that, "either as an independent ground for review or as a judicial gloss on the narrow enumerated grounds for vacatur set forth in § 10(a), a district court may vacate an arbitral award that rests upon a manifest disregard of the law." *Warfield v. Icon Advisers, Inc.*, 26 F.4th 666, 669 (4th Cir. 2022) (cleaned up). To show a manifest disregard of the law, the petitioner must demonstrate that "the applicable legal principle is clearly defined and not subject to reasonable debate," and that "the arbitrator refused to heed that legal principle." *Wachovia Secs., LLC v. Brand*, 671 F.3d 472, 483 (4th Cir. 2012) (cleaned up).

III.

Appellants raise multiple challenges to the arbitration award. As to Capital Investor's claims against them, Appellants contend that the arbitrator erred by concluding that although Blumenfeld is obligated to pay the Required Redemption Amount to Capital Investor, redemption cannot occur until the mortgage is satisfied. They also challenge the arbitrator's determination that Changeover Events and Full Recourse Events had occurred, and the award of attorneys' fees. Appellants also contend that the arbitrator improperly rejected the counterclaims they asserted against Capital Investor.

A.

The Operating Agreement provides that, "for so long as [Blumenfeld] is a guarantor" under the mortgage, Blumenfeld's obligation to pay the redemption amount upon the happening of a Full Recourse Event is "subordinated to any claim of the [Mortgage] Lender against [Blumenfeld] under the Senior Mortgage Loan Documents." J.A. 67. Appellants contend that because Mortgage Lender has not sued Blumenfeld individually, there is no "claim" against Blumenfeld as is required to trigger the subordination provisions, and that, in any event, the subordination provisions apply only if proceeds derived from the Property are used to redeem Capital Investor's interest. Viewing their position as compelled by the language of the Operating Agreement, Appellants insist that the arbitrator's refusal to enforce the contracts in accordance with their unambiguous terms requires us to vacate the award.[2]

It is settled law, however, "neither misinterpretation of a contract nor an error of law constitutes a ground on which an award can be vacated." *Apex Plumbing Supply, Inc. v. U.S. Supply Co.*, 142 F.3d 188, 193–94 (4th Cir. 1998) (cleaned up).

> Because the parties bargained for the arbitrator's construction of their agreement, an arbitral decision even arguably construing or applying the contract must stand, regardless of a court's view of its (de)merits. Only if the arbitrator acts outside the scope of his contractually delegated authority— issuing an award that simply reflects his own notions of economic justice rather than drawing its essence from the contract—may a court overturn his determination. So the sole question for us is whether the arbitrator (even

---

[2] Appellants also contend that the arbitrator exceeded her authority by addressing the question of when the redemption can occur without a hearing or an opportunity for discovery. Because it was Appellants themselves who asked the arbitrator to resolve the redemption-timing question, this argument is manifestly without merit.

arguably) interpreted the parties' contract, not whether [s]he got its meaning right or wrong.

*Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 (2013) (cleaned up).

Contrary to Appellants' assertion, the arbitrator did not go rogue when addressing the redemption question. As noted, the Operating Agreement subordinates Capital Investor's redemption rights to Mortgage Lender's rights and claims under the mortgage loan documents as long as Blumenfeld is a guarantor of the loan. Moreover, in a "Recognition Agreement" executed by Capital Investor and Mortgage Lender, Capital Investor confirmed that all of its rights to distribution under the Operating Agreement are "subordinate and junior to all of [Mortgage Lender's] rights to payment" under the Mortgage documents. J.A. 238. The Recognition Agreement also provides that once a "cash trap" has been put in place, no payment "shall be made by [the mortgagors] with respect to the Preferred Equity Interest" until the mortgage has been satisfied, J.A. 241, and Capital Investor "shall not accept (or otherwise be entitled to retain)" any payment from a guarantor if Mortgage Lender has provided notification that it has an outstanding claim against the guarantor, J.A. 242.

The arbitrator looked to these provisions when concluding that Mortgage Lender had a claim against Blumenfeld even though it had not yet sued Blumenfeld individually and that Blumenfeld therefore could not redeem Capital Investor until the mortgage was satisfied. While Appellants disagree with this analysis, "claim" is not defined in the Operating Agreement, and the arbitrator's analysis is a reasonable reading and

10

reconciliation of the relevant contractual provisions. Because the arbitrator's decision drew its essence from the contract, we are not permitted to overturn it.

### B.

Appellants also challenge the arbitrator's determination that Changeover Events and Full Recourse Events had occurred.

The arbitrator concluded that four Changeover Events had occurred—the failure to make the required Minimum Distributions; the claim of an Event of Default under the mortgage loan; the Company's failure to deposit rent proceeds in the account required by Mortgage Lender; and the failure to properly escrow tenants' security deposits, as required by state law. The arbitrator also determined that two Full Recourse Events had occurred— a 2018 pledge by Blumenfeld of a portion of his interest in the Company without Capital Investor's consent, and Blumenfeld's interference with Capital Investor's attempts to install new management after the Changeover Events.

Appellants contend that the arbitrator was wrong on every point and argue that, under a proper reading of the Operating Agreement, no Changeover Event or Full Recourse Event occurred. These arguments, with their focus on the arbitrator's "incorrect" reading of the contract, again ignore our standard of review. In any event, however, Appellants cannot even show error in the arbitrator's reading of the contract.

The Operating Agreement provides that a Changeover Event occurs upon "[t]he claim by [] Mortgage Lender of the occurrence of an Event of Default under the Senior Mortgage, together with [Mortgage Lender's] commencement of remedial action as a result of such claimed default." J.A. 57. Mortgage Lender declared an event of default and put

11

the cash-trap protocols into place on September 15, 2020, but it did not commence foreclosure proceedings until April 2021. The arbitrator determined that the implementation of the cash trap amounted to remedial action and that a Changeover Event therefore occurred on September 15.

Appellants contend that only a foreclosure proceeding can be viewed as remedial action under the Operating Agreement, which means that no Changeover Event had occurred at the time that Blumenfeld refused to cooperate with Capital Investor's efforts to take over management of the Property. The Operating Agreement, however, does not define "remedial action," and Appellants point to no case law limiting that phrase to the commencement of formal legal proceedings.

Moreover, the cash-trap protocols, which offered a quick means of ensuring payment without having to involve a court, can reasonably be understood as a contractual remedy available to Mortgage Lender. *See Black's Law Dictionary* (11th Ed. 2019) (defining "remedy" as "[t]he means of enforcing a right or preventing or redressing a wrong; legal or equitable relief," and as a "right by which an aggrieved party may seek relief without resort to a tribunal"). Under these circumstances, we see no error in the arbitrator's determination that Mortgage Lender took "remedial action" when it implemented the cash trap.

Because a Changeover Event occurred, Blumenfeld was obligated to cooperate with Capital Investor's efforts to take over management of the Property.[3] Under the Operating Agreement, failure to cooperate amounts to a Full Recourse Event. *See* J.A. 67 (defining Full Recourse Event to include Blumenfeld's "[i]nterference with Capital [Investor's] exercise of its rights or remedies arising as a result of the occurrence of a Changeover Event."). Blumenfeld did not cooperate with Capital Investor, and the arbitrator concluded that his failure to cooperate constituted a Full Recourse Event. While Appellants challenge that finding, their argument is that Blumenfeld was not then obligated to cooperate because no Changeover Event had occurred when his cooperation was sought. As we have just explained, however, a Changeover Event *had* occurred, and the arbitrator therefore properly treated Blumenfeld's failure to cooperate as a Full Recourse Event under the Operating Agreement.[4] Appellants have thus failed to establish any error by the arbitrator, much less the kind of error necessary to set aside an arbitration award.

## C.

Appellants also challenge the award of attorney's fees. The Operating Agreement provides that "[t]he prevailing party in any arbitration proceeding shall be entitled to an

---

[3]    The Operating Agreement gives Capital Investor the right to take over the operation of the Property upon the happening of a single Changeover Event. It is therefore unnecessary for us to consider Appellants' challenges to the other Changeover Events found by the arbitrator.

[4]    Because the failure to cooperate is a Full Recourse Event, we need not consider Appellants' claim that Blumenfeld's 2018 pledge of his interest in the Company did not qualify as a Full Recourse Event.

13

award of all reasonable out-of-pocket costs and expenses (including attorneys' and arbitrators' fees) related to the entire arbitration proceeding (including review if applicable)." J.A. 72. Appellants contend that because Capital Investor's parent company paid the legal bills, Capital Investor was not itself out-of-pocket for the fees, and the arbitrator effectively re-wrote the Operating Agreement in order to award fees.

This argument, like every other argument made by Appellants in this appeal, reflects a misunderstanding of our standard of review. As we have explained, an arbitrator acts in manifest disregard of the law if she is "aware of the law, understood it correctly, found it applicable to the case before [her], and yet chose to ignore it in propounding [her] decision." *Long John Silver's Restaurants, Inc. v. Cole*, 514 F.3d 345, 349 (4th Cir. 2008) (internal quotation marks omitted). Because Appellants cannot point to a case holding that a subsidiary's expenses that are paid for by the parent corporation do not qualify as out-of-pocket expenses of the subsidiary--or that the arbitrator ignored such a case when presented with one—their challenge to the fee award fails.

Appellants fare no better with their argument that the fee award was improper because the arbitrator failed to consider the factors for assessing the reasonableness of fees set out in Delaware's Rules of Professional Conduct. While Delaware *courts* apply those factors when awarding fees, Appellants point to no case from Delaware requiring *arbitrators* to consider those factors when awarding fees in an arbitration proceeding. Moreover, even if the factors are applicable in arbitration proceedings, Appellants cannot establish that the arbitrator *refused* to apply them. The parties addressed the factors in their submissions to the arbitrator, and there is nothing in the arbitration award indicating that

14

the arbitrator declined to consider them, as would be required to show the arbitrator acted in manifest disregard of the law.

D.

Finally, we address Appellants' challenge to the arbitrator's rejection of their claims against Capital Investor.

In their arbitration counterpetition, Appellants asserted material breaches of the Operating Agreement by Capital Investor. They contended that Capital Investor should not have kept the Minimum Distribution payments it received from December 2019 through March 2020, when it knew the Company was behind on the mortgage, and should have instead transferred the funds to Mortgage Lender to bring the account current. According to Appellants, Capital Investor's retention of those funds was the "direct cause" of the Company's default on the mortgage. Brief of Appellants at 37. Appellants also claimed that Capital Investor breached its duty of confidentiality by sharing disparaging, confidential information about the Company with the mortgage loan servicer.

The arbitrator rejected both claims. The arbitrator found that Appellants failed to prove a causal connection between Capital Investor's communications with the loan servicer and Mortgage Lender's declaration of an event of default. The arbitrator likewise found that Appellants failed to prove that Capital Investor's retention of the Minimum Distribution payments made in December 2019 through March 2020 caused the Company to default on the mortgage. The arbitrator noted that the last payment to Capital Investor was made in March 2020, but Mortgage Lender did not trigger the cash trap or declare an

15

event of default until September 2020. In those months after March—when the Company was *not* paying Capital Investor—the Company still failed to bring the mortgage current.

While Appellants disagree with the arbitrator's findings and analysis, "courts do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts. Instead, courts generally defer to an arbitrator's findings and reasoning." *Advantage Veterans Servs. of Walterboro, LLC v. United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l, Loc. 7898*, 70 F.4th 751, 756 (4th Cir. 2023) (cleaned up). Appellants' challenges to these rulings provide no basis for vacating the arbitration award.

## IV.

Accordingly, for the foregoing reasons, we hereby affirm the district court's order confirming the arbitration award.[5]

*AFFIRMED*

---

[5] In its brief, Capital Investor asks for an award of attorneys' fees incurred in defending against what it views as a frivolous appeal. Given the well-settled standard of review and the weakness of the Appellants' arguments, we agree with Capital Investor that this appeal was frivolous. We direct Capital Investor to file within 15 days of this decision a motion detailing the fees and expenses incurred in connection with this appeal. The Appellants may file a response within 15 days thereafter. *See* Fed. R. App. P. 38 ("If a court of appeals determines that an appeal is frivolous, it may, after a separately filed motion or notice from the court and reasonable opportunity to respond, award just damages and single or double costs to the appellee.").